### Richmond

## MARK ANTHONY DOZIER

v.

## COMMONWEALTH OF VIRGINIA

April 20, 1979.

Record No. 781132.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Thomas J. Harrigan (Neil I. Title,* on brief), for appellant.

*Vera S. Warthen, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of thc Court.

We granted this writ to consider whether the Commonwealth's failure to disclose certain evidence in its possession denied defendant Mark Anthony Dozier a fair trial.

Under two indictments tried jointly, one charging statutory rape and the other abduction of a female under the age of 16 for purposes of prostitution, defendant was convicted by a jury of both offenses. Cindy Floyd was the principal witness for the Commonwealth. According to her testimony at trial, she and a girl friend ran away from their homes in Virginia on January 17, 1977. Three days later in Washington, D. C., she met defendant who offered to take her to see a mutual acquaintance named Bunny. Instead, he

drove her, she testified, to the Arna Valley Apartments in Arlington where he raped her and told her he wanted her to work for him as a prostitute. During the two days she stayed in the apartment, the doors were locked and she did not feel free to leave. In the five-day period before she was found by the police and returned to her father, defendant required her "to work on the streets" and she engaged in sexual relations for money with a number of men.

The jury returned the guilty verdicts December 9, 1977. On April 5, 1978, defendant filed a motion for new trials on both convictions. The motion was based upon the ground that defendant had been denied a fair trial because the Commonwealth had failed to disclose a hand-written statement Cindy had given the police when she was apprehended. The statement was an account of the events of the previous five days. Never identifying defendant by name, Cindy wrote that "some guy started talking to me and said he would take me where Bunny was but instead he took me to the apartments at Arnu [sic] Valley and wanted me to work on the streets, so he got me an I D card so if a police stops me I just show them it." She mentioned nothing in her statement about sexual relations with defendant at the Arna Valley Apartments and nothing about being held there against her will.

At a hearing on April 12, 1978, defendant argued that Cindy's extra-judicial statement tended to contradict her testimony at trial and that the Commonwealth had a duty to make it available to him for impeachment purposes. The trial court filed a memorandum opinion finding that defendant "learned of the existence" of the statement on March 22, 1978; that the Commonwealth had the statement in its possession prior to commencement of trial; and that defendant had never made any request "for the specific statement (such being unknown to the Defendant) or for any exculpatory material in the Commonwealth's file". Upon these findings, the trial court ruled that, with respect to the rape conviction, "the absence of any mention [in the statement] of sex with Defendant . . . creates a reasonable likelihood of affecting the trier of fact" and makes the statement "material in the constitutional sense and as such exculpatory and requires the granting of the Motion for a New Trial." The trial court concluded further, however, that the written account of the abduction for purposes of prostitution was "consistent with her version . . . at trial" and, holding that the statement was not constitutionally material to that charge, denied the motion for a new trial. By judgment entered

May 5, 1978, defendant was sentenced to 20 years in the penitentiary, with five years suspended.

The standards and rules governing non-disclosure of exculpatory evidence in the hands of the prosecution differ in "three quite different situations." *United States* v. *Agurs*, 427 U.S. 97, 103 (1976). For the sake of convenience, we will refer to these three as the *Mooney* situation, *Mooney* v. *Holohan*, 294 U.S. 103 (1935); the *Brady* situation, *Brady* v. *Maryland*, 373 U.S. 83 (1963); and the *Agurs* situation, *Agurs*.

The *Mooney* situation is one where the prosecution knowingly uses perjured testimony. The rule in such case is that "a conviction . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury". *Agurs*, 427 U.S. at 103.

The *Brady* situation is one where the defendant has made an express request for specific evidence which is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "[I]mplicit in the requirement of materiality [in the *Brady* situation] is a concern that the suppressed evidence might have affected the outcome of the trial." *Agurs*, 427 U.S. at 104.

In the *Agurs* situation, the defendant, having no knowledge that any favorable evidence exists, either makes no request at all or makes only a general request for whatever exculpatory evidence the prosecution might have. "[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Agurs*, 427 U.S. at 110. In such situations, the prosecution's failure to *volunteer* the evidence constitutes constitutional error "if the omitted evidence creates a reasonable doubt that did not otherwise exist". *Id.*, at 112.

In summary, the Supreme Court has defined three situations requiring disclosure, each with its own standard of constitutional materiality. From a defendant's viewpoint, the least onerous is the "might have affected" standard in the *Brady* situation, followed progressively by the "reasonable likelihood" standard in the *Mooney* situation and the "reasonable doubt" standard in the

*Agurs* situation.*

From the findings upon which the trial judge based his ruling setting aside the rape conviction, it seems he considered the situation at bar an *Agurs* situation. Finding as a fact that the existence of the written statement was unknown to defendant until after conviction, and that defendant had made no specific or general request for exculpatory material, he ruled that the Commonwealth was under a duty to volunteer disclosure. As the following cross-examination of Cindy shows, this factual finding, made more than four months after trial, was in error:

Q. And at the Youth Division they asked you to write a statement?

A. Yes.

Q. And you wrote the full statement?

A. Yes.

Q. And in that statement did you ever mention in the written statement any of the events that surround this case?

A. I don't remember. I didn't put in details.

. . . .

Q. In the written report to the police did you intentionally leave out that you were raped and kidnapped?

A. Yes.

Q. Do you have a copy of that report?

A. No.

MR. SHER [defense counsel]: I don't have a copy of that report. I think it is exculpatory and I would like to have it.

THE COURT: Do you have it, Mr. Melson [attorney for the Commonwealth]?

MR. MELSON: I do not know quite frankly if I have it.

---

*The dissent in *Agurs* challenges the conceptual and functional viability of the majority's "reasonable doubt" standard. But since we conclude below that this is not an *Agurs* situation, we are not concerned here with the viability of that standard.

THE COURT: Let's move on, gentlemen and get the witness off the stand.

Thus, the record shows that defense counsel was aware at trial of the existence of a statement, written at the request of the authorities, which failed to incriminate defendant; that he considered the statement favorable to the defense; and that he requested a copy. This presented a *Brady* situation, and the ultimate question before the trial judge was whether the undisclosed evidence met the "might have affected" standard. But, as the memorandum opinion shows, he applied the more onerous "reasonable likelihood" standard designed for the *Mooney* situation. The statement met that standard, he found, but only with respect to the rape conviction. Applying the *Brady* standard, we believe the statement was constitutionally material to the abduction charge as well.

The exculpatory value of Cindy's extra-judicial statement was its utility for discrediting her as a witness. Speaking in a case involving the *Mooney* situation, the Supreme Court has held that, even when the suppressed evidence "goes only to the credibility of the witness", it is as material in the constitutional sense as evidence which goes directly to the question of guilt where "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence". *Napue* v. *Illinois*, 360 U.S. 264, 269 (1959). *See also Giglio* v. *United States*, 405 U.S. 150 (1972). In our view, the same is true in a *Brady* situation such as the one at bar.

Cindy testified that the reason she had not incriminated defendant in her written statement was that she did not want her father to learn all that had happened. The Commonwealth argued that, in light of this explanation, any error in non-disclosure of the statement did not rise to constitutional stature. Rejecting that argument on the ground that the jury's verdict "depended essentially on the credibility of one witness", the trial court granted a new trial on the rape charge. The credibility of the same witness was equally essential to the abduction conviction. We recognize, as the trial court said, that the written account of the abduction was substantially consistent with Cindy's testimony at trial. Yet, while her statement identified two individuals by name, she never named defendant as her abductor. This omission bore directly upon the credibility of her abduction testimony. Moreover, if the written statement had been disclosed and the jurors believed she falsified her testimony about the rape charge, they might have believed she falsified both her testimony and her written state-

ment about the abduction charge. If so, since there was no other evidence sufficient to establish abduction, we are of opinion "the suppressed evidence might have affected the outcome of the trial."

We hold, therefore, that the trial court erred in confirming the abduction conviction and that this error infringed defendant's constitutional right to a fair trial. The judgment will be reversed and the case remanded for a new trial on that charge.

*Reversed and remanded.*