## Richmond
EDWARD B. FITZGERALD

v.

GARY BASS, Warden
Mecklenburg Correctional Center
No. 0511-85
Decided March 15, 1988

40

Counsel

Peter J. Murtha; Bradley S. Stetler, for appellant.

Robert H. Anderson, III, Assistant Attorney General
(William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

## ON REHEARING EN BANC

**KEENAN, J.** — Edward Fitzgerald appeals from the denial of his petition for a writ of habeas corpus. The issues we address are: (1) whether Fitzgerald was improperly denied an evidentiary hearing on certain claims; (2) whether the testimony of prosecution witness, Wilbur Caviness, deprived Fitzgerald of due process; and, (3) whether Fitzgerald was denied effective assistance of counsel.[1] We dismiss that part of Fitzgerald's appeal which deals with his capital murder conviction because under our jurisdictional statutes, as interpreted in *Peterson v. Bass*, 2 Va. App. 314, 318, 343 S.E.2d 475, 478, *aff'd en banc*, 3 Va. App. ____, 349 S.E.2d 409 (1986), we lack jurisdiction to hear habeas corpus appeals arising from convictions where the death penalty has been imposed. With respect to the non-capital convictions, we find no error in the habeas court's denial of the writ.

## I. *FACTS*

The facts of this case are detailed in the Supreme Court's opinion affirming Fitzgerald's convictions on direct review. *Fitzgerald v. Commonwealth*, 223 Va. 615, 621-26, 292 S.E.2d 798, 801-04 (1982), *cert. denied*, 459 U.S. 1228 (1983). Only a brief recitation is necessary here. Primarily through the testimony of a codefendant, Daniel Johnson, and a fellow inmate, Wilbur Caviness, the Commonwealth established that Fitzgerald raped, abducted, robbed, and murdered Patricia Cubbage.

The evening these events took place began with Cubbage, Johnson, Fitzgerald and others drinking beer and smoking marijuana at Fitzgerald's apartment. Cubbage eventually left the group and went home. Johnson and Fitzgerald went to the home of David Bradley, who was a friend of Fitzgerald's. Johnson testified that upon leaving the Bradley home, Fitzgerald suggested that they go to the home of another friend for the purpose of breaking in and

---

[1] On July 7, 1987, a panel of this Court affirmed the trial court's denial of Fitzgerald's petition for a writ of habeas corpus. 4 Va. App. 371, 358 S.E.2d 576 (1987). A dissenting opinion was filed with regard to the panel's decision that the testimony of prosecution witness, Wilbur Caviness, did not deprive Fitzgerald of due process of law. Pursuant to Code § 17-116.02(D), this Court convened en banc to consider that issue.

stealing drugs. Cubbage was staying in this home, and when Fitzgerald broke in, he ran upstairs to her bedroom. There, Fitzgerald raped and beat Cubbage. He then forced her from the house and into the car, taking her purse in the process.

Johnson and Fitzgerald drove Cubbage to a remote area where she was taken from the car into some woods. After forcing Cubbage to engage in oral sodomy, Fitzgerald killed her by repeatedly striking her with a machete. He later told Wilbur Caviness, a fellow inmate in the Chesterfield County Jail, that he raped and murdered Cubbage because she had "snitched" on him. Detective William Shuman of the Richmond Bureau of Police testified that Cubbage had worked as an informant for him and that another word for informant was "snitch."

The jury convicted Fitzgerald of capital murder, armed robbery, rape, abduction with intent to defile, and burglary. Upon finding that Fitzgerald's conduct met the vileness standard of Code § 19.2-264.4(C), the jury recommended the death penalty for the capital murder conviction. For each of the remaining convictions, the jury recommended life imprisonment. The trial court imposed the jury sentences and the Supreme Court of Virginia affirmed the convictions. *Fitzgerald*, 223 Va. at 640, 292 S.E.2d at 813.

Fitzgerald then filed a petition for a writ of habeas corpus in the circuit court. An amended petition and a bill of particulars were also filed. After hearing argument, but without taking evidence, the court dismissed the majority of Fitzgerald's claims on the grounds that they had previously been determined on direct appeal, or had been waived by failure to raise them on appeal. Later, the court denied Fitzgerald's motion for an evidentiary hearing on his allegation that codefendant, Daniel Johnson, had failed to disclose to the jury the full extent of his knowledge of a plea agreement being negotiated on his behalf with the Commonwealth.

A plenary hearing was held on June 21-22, 1984, to consider the remainder of Fitzgerald's claims. On February 26, 1985, the court issued a comprehensive opinion stating its findings of fact and conclusions of law. The court found that Fitzgerald had not been denied due process or effective assistance of counsel. Accordingly, the petition was denied. It is from this order that Fitzgerald

appeals.

## II. *DENIAL OF EVIDENTIARY HEARING*

Daniel Johnson was a codefendant in these cases. He testified that he had discussed the charges with his attorney, Richard Ryder, and that Ryder advised him to testify truthfully. Johnson further testified that he had not been promised anything in return for his testimony, and that Ryder had not discussed with him what might be expected in return for his testimony.

On cross-examination, the following colloquy took place:

Q. You know there is no chance of you going to the electric chair if you testify in this case, don't you?

A. No, sir, I don't know that.

Q. You mean to tell the jury that you are coming in here today and confessing to your implication in the crime and you don't have any idea how your case is going to be disposed of?

A. No, sir, I don't have any idea how it will be disposed of.

Q. Did your attorney advise you to testify in here today?

A. Yes, sir, he did.

The next day the prosecutor called Ryder as a witness. Prior to doing so, the prosecutor informed the court, out of the presence of the jury, that discussions had taken place with Ryder regarding Johnson's case. The prosecutor told the court that the jury should be informed of these discussions so that there would be no misunderstanding of Johnson's testimony. Ryder then testified before the jury that he had discussed the possible disposition of Johnson's case with the Commonwealth, but that he had not talked to Johnson about it. On cross-examination, Ryder stated: "[T]he Commonwealth has agreed if my client would come in court and testify to the truth that the Commonwealth Attorney would seek, at worst, to convict my client of first degree murder and would recommend to the court that the maximum sentence my client be subjected to is 40 years in the penitentiary."

■ Fitzgerald alleged in his habeas petition that Johnson and Ryder misstated to the jury the extent of Johnson's knowledge of the plea negotiations. The court refused to conduct an evidentiary hearing on this allegation, dismissing it on the record. Code § 8.01-654(B)(4). In so doing, the court agreed with the Commonwealth that this allegation failed to set forth sufficient facts to justify an evidentiary hearing. The rule in Virginia is that habeas corpus petitions must allege sufficient facts which, if true, would support the conclusion of law advanced. As the Supreme Court stated in *Penn v. Smyth*, 188 Va. 367, 370-71, 49 S.E.2d 600, 601 (1948), "mere conclusions or opinions of the pleader will not suffice to make out a case."

Here, the petition essentially alleged that Johnson and his attorney committed perjury and that the Commonwealth took advantage of this perjury by failing to correct it. Fitzgerald argues that under *Giglio v. United States*, 405 U.S. 150, 155 (1972), he was entitled to have the jury know what agreements or understandings existed between Johnson and the Commonwealth. He further argues that Johnson and his attorney failed to disclose the full extent of Johnson's understanding with the Commonwealth, and that this failure amounted to an improper restriction on his right of cross-examination. *Hoover v. Maryland*, 714 F.2d 301, 305 (4th Cir. 1983).

While we agree with the principles of law relied upon by Fitzgerald, we do not agree that the habeas petition, as supplemented, set forth sufficient facts to justify an evidentiary hearing on his claim. Initially, the petition stated nothing more than Fitzgerald's conclusions, nor were any supporting affidavits filed. For example, in his motion for a hearing, Fitzgerald stated that he was "in possession of evidence which will establish that Mr. Johnson testified untruthfully about his knowledge of the plea agreement. . .[and] he (Fitzgerald) came into possession of this evidence through an interview he had with a witness." The witness was not identified, nor was a proffer of the witness's testimony made to the court.

Later, Fitzgerald filed the following "statement of facts" allegedly establishing the substance of this claim:

Daniel L. Johnson, through his attorney, knew that a plea agreement was being negotiated on his behalf. He knew that the discussions between his attorney and the Commonwealth involved his cooperation against petitioner in exchange for the imposition of a 40 year sentence by the Court. Mr. Johnson discussed with his attorney the possibility of having 20 years of the 40 years suspended. Mr. Johnson was aware of these discussions and of his possible 40 year sentence or less prior to his testimony against petitioner.

Finally, after the court denied the request for an evidentiary hearing, Fitzgerald filed a motion to reconsider in which he revealed for the first time that his claim was based upon information given to his attorney by Daniel Johnson at the St. Bride's Correctional Center. The court denied the motion to reconsider.

In none of his various allegations pertaining to this claim did Fitzgerald contend that the Commonwealth was aware of Johnson's alleged perjury. Further, he never alleged that the court improperly restricted cross-examination on this subject. Without such allegations, Fitzgerald failed to set out a prima facie violation of the rule stated in either *Giglio* or *Hoover*.

In *Giglio*, the Supreme Court stated that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice. . .[and] [t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" 405 U.S. at 153 (citations omitted). Applying this rule, the Court found that the prosecution had allowed the jury to believe that a key government witness had not been promised anything in return for his testimony when, in fact, an Assistant U.S. Attorney had promised immunity to the witness. Although the assistant who tried the case did not know of the immunity promise, the Court attributed knowledge of the promise to the entire office. *Id.* at 154. It is apparent from *Giglio* that knowledge of the false testimony, even if constructive, was crucial to the Court's decision to reverse the conviction.

In *Hoover*, the court of appeals reversed a conviction because the trial judge had unduly limited the extent to which counsel could cross-examine a crucial government witness regarding an

immunity agreement. The court stated:

> This sustained and effective refusal to permit inquiry into [the witness'] subjective understanding of his bargain with the government stepped beyond the constitutional bounds of the trial court's discretion, and abridged the fundamental right to confront adverse witnesses secured to Hoover by the fourteenth amendment.

714 F.2d at 306.

These cases do not establish a rule that the after-discovered perjury of a government witness constitutes a basis for habeas relief. Such a claim may support a timely motion for a new trial, but unless the Commonwealth knew of the perjury, or the court prevented effective cross-examination of the witness, no denial of due process has occurred and no basis for habeas relief exists. As stated in *Lacey v. Palmer*, 93 Va. 159, 163, 24 S.E. 930, 931 (1896): "[T]he office of the writ of *habeas corpus* is not to determine the guilt or innocence of the prisoner. The only issue which it presents is whether or not the prisoner is restrained of his liberty by due process of law." Further, it is well settled that habeas corpus cannot be used "to perform the function of an appeal or writ of error, to review errors, or to modify or revise a judgment of conviction pronounced by a court of competent jurisdiction. It can not be used to secure a judicial determination of any question which, even if determined in the prisoner's favor, could not affect the lawfulness of his immediate custody and detention." *Smyth v. Midgett*, 199 Va. 727, 730, 101 S.E.2d 575, 578 (1958).

There is nothing in the record, or in Fitzgerald's allegations, to indicate that the prosecutor took advantage of perjured testimony or that the court improperly restricted cross-examination. At best, Fitzgerald's petition stated a claim of newly-discovered evidence affecting the credibility of a government witness. This, however, is unrelated to the legality of Fitzgerald's detention, and does not state a basis for habeas relief. The court, therefore, did not err in dismissing this claim without a hearing.

## III. *TESTIMONY OF WILBUR CAVINESS*

Wilbur Caviness was an inmate of the Chesterfield County Jail during the period of Fitzgerald's incarceration. Caviness testified at trial that while in jail, Fitzgerald confessed to him that he raped and murdered Patricia Cubbage. Fitzgerald argues that use of Caviness' testimony denied him due process of law because the Commonwealth failed to disclose certain evidence which could have been used to impeach Caviness. Specifically, Fitzgerald contends that despite a request for such information, the Commonwealth failed to disclose that Caviness had been twice convicted of sodomy in Norfolk and was on probation for such crimes when he testified against Fitzgerald; that Caviness had various misdemeanor convictions involving moral turpitude; that he had two pending felony charges in Henrico County; that he was a paid informant for the State Police on cases not involving Fitzgerald; and that he was reimbursed for expenses connected with his testimony.

The record reveals that prior to trial defense counsel requested, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), "any and all evidence of any kind whatsoever, known by the Commonwealth's Attorney to be within the possession, custody or control of the Commonwealth, or by the exercise of due diligence should be known by the Commonwealth's Attorney to be within the possession, custody or control of the Commonwealth . . . which affects the credibility of any of the Commonwealth's anticipated witnesses."

The Commonwealth responded that it was "unable to ascertain what may affect the credibility of any of the Commonwealth's witnesses." The Commonwealth further responded:

These are matters counsel must contend with at trial. While some courts recognize the requirement of materiality is met where the evidence would only affect the credibility of witnesses, Virginia is not one of those courts. . . . While this may not be an attempt to ascertain names of Commonwealth's witnesses, it would amount to an indirect approach to that which cannot be had directly.

██ The Commonwealth's response was clearly in error[2]; however, Fitzgerald did not request the trial court to reject the Commonwealth's position and no further attempt was made to obtain impeachment evidence. The court below ruled that Fitzgerald's failure to object to the Commonwealth's position prior to trial, or on appeal, precluded consideration of the issue on habeas review. We agree.

This is not a situation where the Commonwealth responded falsely that it was not in possession of exculpatory evidence. Failure to object to such a response would not bar habeas review since ordinarily counsel would have no reason to believe that the Commonwealth was, in fact, withholding evidence. Here, the Commonwealth essentially responded that impeachment evidence was not subject to discovery. Fitzgerald had every opportunity to challenge the Commonwealth's position in this regard, but failed to do so. Having accepted the Commonwealth's response at trial, Fitzgerald may not contest it for the first time on habeas review. As stated above, habeas corpus is not a substitute for appeal. *Slayton v. Parrigan*, 215 Va. 27, 29-30, 205 S.E.2d 680, 682 (1974), *cert. denied*, 419 U.S. 1108 (1975); *Crank v. Rogers*, 1 Va. App. 491, 495, 339 S.E.2d 909, 912 (1986).

Fitzgerald further objects to the testimony of Caviness on the ground that the Commonwealth failed to correct certain testimony of his that was false. As discussed in Section II, *supra*, the Commonwealth may not knowingly rely on false testimony to secure a conviction, whether such testimony is actively solicited or simply allowed to go uncorrected. *Giglio*, 405 U.S. at 154-55.

---

[2] "[I]mpeachment evidence . . . as well as exculpatory evidence falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985)(quoting *Brady*, 373 U.S. at 87) (citations omitted); *see Dozier v. Commonwealth*, 219 Va. 1113, 1118, 253 S.E.2d 655, 658 (1979).

The Commonwealth's Attorney seems to have confused the above rule with Virginia's policy against providing lists of prosecution witnesses, or their statements, to criminal defendants. *See Bellfield v. Commonwealth*, 215 Va. 303, 306, 208 S.E.2d 771, 774 (1974), *cert. denied*, 420 U.S. 965 (1975). It is true that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). An exception exists, however, for evidence which is considered exculpatory under *Brady*. *United States v. Kendall*, 766 F.2d 1426, 1440 (10th Cir. 1985), *cert. denied*, 106 S. Ct. 848 (1986).

During the trial, Caviness testified that he had no pending charges against him when, in fact, he had two pending felony charges in Henrico County. He did acknowledge on cross-examination that at the time he met Fitzgerald he had a breaking and entering charge pending against him; however, he incorrectly stated that the charge had been "broken down" to petit larceny. In addition, Caviness gave an incomplete accounting of his prior conviction record. When asked whether he had any felony convictions, Caviness replied only that he had been convicted of breaking and entering.[3] In fact, Caviness also had two prior felony convictions for sodomy which he failed to reveal. Next, when asked whether he had been convicted of any misdemeanors involving moral turpitude, Caviness replied, "Yes sir, I have something like that, yes sir." No further questions were asked on this subject. The habeas court found that Caviness, in fact, had four prior misdemeanor convictions involving moral turpitude.

After hearing testimony regarding this allegation, the habeas court found that while there were inaccuracies in Caviness' testimony, the Commonwealth had no actual or constructive knowledge of these inaccuracies. The court further found that any misstatements made by Caviness were the result of innocent misunderstandings on his part rather than perjury. Finally, the court found that even if the Commonwealth had actual or constructive knowledge of the inaccuracies in Caviness' testimony, Fitzgerald had failed to establish sufficient materiality or prejudice to require a new trial.

We accept the factual findings of the lower court that Caviness did not commit perjury and that the Commonwealth had no actual knowledge that Caviness misstated certain aspects of his criminal history. *See Nolan v. Peyton,* 208 Va. 109, 112, 155 S.E.2d 318, 321 (1967); *Abney v. Warden,* 1 Va. App. 26, 30, 332 S.E.2d 802, 804 (1985). Such findings, however, do not dispose of Fitzgerald's contention. Regardless whether Caviness intentionally or unintentionally misstated his criminal history, the jury did not

---

[3] There is some confusion in the record regarding this statement. Caviness testified at the habeas hearing that his reference to a breaking and entering conviction at trial related to the charge for which he was imprisoned at the time he talked to Fitzgerald. On this charge, Caviness was ultimately convicted of the *misdemeanor* of petit larceny. However, it appears from the record that Caviness was convicted of breaking and entering in Richmond in 1974.

hear the truth, and it is the truth of the testimony which is the relevant concern, not the state of mind of the witness. As stated in *Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir. 1986): "The constitutional concerns address the realities of what might induce a witness to testify falsely, and the jury is entitled to consider those realities in assessing credibility."

■ Further, the prosecutor's lack of actual knowledge that testimony is false does not automatically excuse his failure to disclose the truth. Thus, in *Giglio*, where a witness falsely testified that nobody had told him he would not be prosecuted in return for his testimony, the Supreme Court assigned no significance to the prosecutor's lack of actual knowledge that such a promise had been made by a different attorney in the same office. The Court stated: "Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." 405 U.S. at 154.

We accept the finding by the habeas court that no one in the prosecutor's office knew of Caviness' criminal record; however, constructive knowledge is also attributed to the prosecutor where the information is in possession of the police. *United States v. Jackson*, 780 F.2d 1305, 1308 n.2 (7th Cir. 1986); *Wedra v. Thomas*, 671 F.2d 713, 717-18 n.1 (2nd Cir.), *cert. denied*, 458 U.S. 1109 (1982); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980); *Barbee v. Warden*, 331 F.2d 842, 844, 846 (4th Cir. 1964). On the other hand, constructive knowledge has not been attributed to the prosecutor where the information was in possession of law enforcement officials of different jurisdictions. *United States v. Walker*, 720 F.2d 1527, 1535 (11th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984)(knowledge of state officials not attributed to federal prosecutor); *United States v. Lawrenson*, 298 F.2d 880, 888 (4th Cir. 1962).

In this case, Caviness testified falsely about his criminal record, but the Commonwealth's attorney had no actual knowledge of the falsity of the testimony. We must decide whether the Commonwealth's attorney should have known that the testimony was false. Two statements made by Caviness are in issue. First, he told the jury that he had one prior felony conviction when in fact he had three. Second, he told the jury that he had no pending charges

when in fact he had two pending grand larceny charges.[4]

The Commonwealth argues that since the undisclosed convictions and charges occurred outside of Chesterfield County, the Commonwealth's attorney of that jurisdiction should not be charged with knowledge of them. It argues that prosecutors would be overburdened by such a requirement. We disagree.

Caviness' criminal record was readily available to the Chesterfield prosecution team through the Virginia Criminal Information Network computer. It was established at the habeas hearing that the Chesterfield County Commonwealth's attorney's office had access to this system through the police department. Donald Hines, Assistant Commonwealth's attorney in Chesterfield and a member of the Fitzgerald prosecution team, testified: "I can go to the Chesterfield County Police Department and fill out a form and receive back [a] central criminal records exchange form . . . [and] the printout is almost immediate on the central criminal records exchange."

Charles Watson, Commonwealth's Attorney for Chesterfield County, was asked at the habeas hearing whether his office would have been able to run a check of Caviness' criminal record through this system. He replied, "Certainly." Despite this admitted capability, both Watson and Hines acknowledged that no such check was attempted. Apparently, Watson's only inquiry to Caviness regarding his criminal record was "are we through with you?" (referring to the breaking and entering charge Caviness was serving time for in the Chesterfield Jail at the time he encountered Fitzgerald). Regarding the availability of Caviness' record, Hines acknowledged that "most probably it occurred (sic) on the computer at the time and would have been available. I do not know for a fact because I did not run the record check."

We do not believe that an unreasonable burden is imposed on the Commonwealth if required to discover the criminal record of

---

[4] These are the only two statements made by Caviness that were false. Although he initially stated that he did not have any misdemeanor convictions involving moral turpitude, the prosecutor rephrased the question and asked him whether he had any such convictions. Caviness then responded, "Yes sir, I have had something like that, yes sir." This was not a false or misleading statement. Defense counsel could have inquired as to the number and nature of such convictions, but declined to do so. *See Hackman v. Commonwealth*, 220 Va. 710, 714, 261 S.E.2d 555, 559 (1980).

its witnesses, especially when such information is readily available. This is particularly true when the prosecution knows in advance that the witness has a criminal background. In the present case, Hines had prosecuted Caviness on the breaking and entering charge in Chesterfield. He further knew that Caviness had an ongoing relationship as an informant for the Virginia State Police. As Hines stated at the habeas hearing: "[I]t was no big secret that Mr. Caviness was a member of the criminal community. He had done time in the Chesterfield County Jail. Indeed, that is where he met Eddie Fitzgerald."

In *Giglio*, the Supreme Court acknowledged that its ruling imputing the actions of one prosecutor to the entire office would impose a burden. The Court stated, however, that "procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." 405 U.S. at 154.

In the related context of a *Brady* violation, the court in *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984), stated: "[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance." We also agree with the court in *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980), where it stated:

> " 'The basic import of *Brady* is . . . that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness' . . . If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government."

*Id.* at 481 (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975), *cert. denied*, 425 U.S. 911 (1976)).

We find, therefore, that under the facts presented here, the Commonwealth's attorney should have known that Caviness testified falsely regarding his prior felony convictions and pending criminal charges. Under *Giglio*, use of such testimony was material, and a new trial is required if " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264,

271 (1959)); *see also Campbell v. Reed*, 594 F.2d 4, 8 (4th Cir. 1979).[5] The Supreme Court has stated that this standard is equivalent to the "harmless beyond a reasonable doubt" standard established in *Chapman v. California*, 386 U.S. 18, 24 (1967). *Bagley*, 473 U.S. at 679. Evidence relevant to the credibility of a witness is as material in the constitutional sense as evidence which goes directly to the question of guilt where " '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.' " *Dozier v. Commonwealth*, 219 Va. at 1118, 253 S.E.2d at 658 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

In determining materiality and whether there is any reasonable likelihood that the judgment of the jury would have been affected had the Commonwealth corrected Caviness' testimony, we must consider his testimony in the context of the entire trial. Facing a similar situation, the court in *Breest v. Perrin*, 624 F.2d 1112 (1st Cir. 1980), stated the approach as follows:

> [W]e shall first assess the nature and strength of the incriminating evidence, compared to that of contradicting evidence. We shall then focus on the thrust of Carita's testimony, the extent to which he had been subject to impeachment at trial, and the extent to which he would have been rendered more vulnerable had the full story of his understanding with the sheriff been revealed. Finally, we shall have to determine whether any such additional vulnerability could in any reasonable likelihood have caused the jury to bring in a verdict of not guilty.

*Id.* at 1115-16.

Applying this approach to the present case, we note initially that Caviness' testimony related only to the rape charge (and the

---

[5] The Commonwealth has suggested that the appropriate standard is whether there is "a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Robinson v. Commonwealth*, 231 Va. 142, 151, 341 S.E.2d 159, 165 (1986). This standard was fashioned by the Court to deal with non-disclosure of *Brady* material, whether or not the defense has requested such disclosure and whether any such request was general or specific. While we do not find that *Bagley* is inapplicable to the issue presented here, we elect to rely on *Giglio* because the facts presented before us more closely parallel those in *Giglio*.

capital offense charge not involved in this appeal). As to the rape charge, the jury heard from Johnson that Fitzgerald accosted Patricia Cubbage in her bedroom, pulled the covers off her and said: "I have always heard that you were a good fuck and a good piece of ass and I am going to find out." Johnson observed that Cubbage was nude. He testified that Fitzgerald crawled onto the bed, unzipped his pants and pulled them down to his thighs. Johnson then turned away, but he said that he heard Cubbage say: "I am on my period. I have a tampon in." Johnson later saw a tampon on the side of the bed, but he stated that he began to feel sick and turned away. He heard the bed squeaking and Cubbage breathing hard. He testified that when he next looked at the bed he saw Fitzgerald pulling his pants up and heard him say to Cubbage: "You are not worth a fuck." The jury also heard from a forensic scientist that a pubic hair consistent with Fitzgerald's pubic hair was found in the sheets of Cubbage's bed.

Caviness testified that Fitzgerald confessed to him that he had "screwed" Cubbage and cut her up because she had "snitched on him." Because neither Johnson nor the forensic scientist could state whether penetration had taken place, Caviness' testimony was, as conceded by the Commonwealth, "not unimportant." We find, therefore, that Caviness' testimony was material to the rape conviction in the sense that the jury's estimate of his credibility may well have been determinative of guilt. *Dozier*, 219 Va. at 1118, 253 S.E.2d at 658.

We turn now to the extent of Caviness' impeachment at trial and the extent to which his credibility would have been rendered more suspect had the Commonwealth corrected his false testimony. We conclude that while there was a difference between what the jury was told about Caviness' record and the truth of the matter, there is no reasonable likelihood that the matters not disclosed would have affected the judgment of the jury. Although Caviness failed to disclose his two felonious sodomy convictions, he did admit to having a felony conviction for breaking and entering. The jury knew, therefore, that Caviness was a convicted felon. The jury also knew that Caviness had "something like" a misdemeanor conviction involving moral turpitude. It was further apparent to the jury that Caviness had spent some time in jail since he acknowledged being in jail on a breaking and entering charge ("broken down to petit larceny") at the time he encountered Fitz-

gerald. In short, while the jury may not have known the full extent of Caviness' record, or that he was facing additional charges, it did know that he had a substantial criminal background. This point was properly emphasized to the jury by defense counsel in his closing argument. He reminded the jury that Caviness was a "convicted felon, a person involved in crimes of moral turpitude and a multiple offender—a jailbird and a drone."

Although counsel could have argued that the pending charges, as well as Caviness' history of being a police informant in cases not involving Fitzgerald, gave him a motive to provide testimony favorable to the Commonwealth, we believe that, given the extent to which Caviness' credibility was impeached, it is doubtful that additional evidence in this regard would have made a difference in the jury's opinion of his credibility. *See United States v. Jackson*, 780 F.2d 1305, 1310-11 (7th Cir. 1986).

An additional relevant factor is, as argued by the Commonwealth's attorney, that Caviness' account of Fitzgerald's statements contained aspects of the crime which had not been released to the public. For example, Caviness' testimony regarding the manner in which Fitzgerald claimed to have mutilated the body corresponded with both Johnson's testimony and the testimony of the pathologist. Further, Caviness' testimony that Fitzgerald committed the crime because Cubbage "snitched on him" corresponded with Johnson's testimony that shortly before the crime Fitzgerald had been mumbling about how Cubbage had "ripped him off." There was a strong inference, therefore, that Caviness' testimony regarding these events came from his conversation with Fitzgerald. As stated in *Breest*, "testimony that fits like the final piece of a puzzle into an increasingly clear pattern needs a much stronger rebuttal than one that stands almost alone as a purported representation of the whole." 624 F.2d at 1117. Viewed in the context of the entire trial, we find that since Caviness was subjected to substantial impeachment, and since his testimony was largely corroborative of other testimony, there is no reasonable likelihood that disclosure of another felony conviction and two pending charges would have affected the judgment of the jury.[6]

---

[6] As discussed previously, we do not address that part of this claim which deals with failure to disclose *Brady* material concerning Caviness. Fitzgerald waived any right to raise such a claim by failing to object at trial. Our finding here deals only with the claim that the Commonwealth allowed certain false statements made by Caviness to go uncorrected.

## III. *INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL*

Fitzgerald next argues that his appellate counsel was ineffective on direct appeal because he failed to contest the sufficiency of the rape and robbery evidence.[7]

■ The right to effective assistance of appellate counsel, on a first appeal of right, was recognized by the United States Supreme Court in *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). There, the Court declined to "decide the content of appropriate standards for judging claims of ineffective assistance of appellate counsel." *Id.* at 392. However, in reviewing prior case law concerning the right to court-appointed appellate counsel the Court stated: "[T]he attorney need not advance *every* argument, regardless of merit, urged by the appellant . . . and must play the role of an active advocate." *Id.* at 394 (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *Anders v. California*, 386 U.S. 738 (1967))(emphasis in original).

■ In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two part test for evaluating claims that trial counsel had been ineffective. First, it must be shown that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. Second, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

---

[7] Fitzgerald also argues that he was deprived of the effective assistance of counsel at trial; however, we find that none of these claims are properly before us. Most of these claims relate to the capital murder conviction and are thus beyond our jurisdiction. *Peterson*, 2 Va. App. at 318, 343 S.E.2d at 478. The remainder of these claims were not briefed on appeal and are thus waived. *Quintana v. Commonwealth*, 224 Va. 127, 134 n.1, 295 S.E.2d 643, 645-46 n.1 (1982), *cert. denied*, 460 U.S. 1029 (1983).

We do not accept as sufficient compliance with Rule 5A:20, requiring a statement of the principles of law and authorities relating to each question, counsel's footnote stating:

"Because of the limitations of space, appellant is unable to brief all of the ineffective or substantive claims raised in the petition and amended petitions. Appellant does not waive any of those claims and hereby reasserts the validity (sic) of each of the claims raised in the court below."

Over one hundred claims, including sub-parts, were assigned in the petition and amended petition. We do not deem it our function to comb through the record of this four day trial in order to ferret-out for ourselves the validity of these claims, assisted only by counsel's conclusory footnote.

at 694.[8]

██ We believe that a similar approach must be applied to the question whether appellant was denied effective assistance of appellate counsel. As *Evitts* and *Strickland* make clear, counsel's performance must be constitutionally effective at both the trial and appellate levels. In *Strickland*, the Court stated:

> [T]he Sixth Amendment refers simply to "counsel" not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

466 U.S. at 688 (citation omitted). It follows that appellate counsel's performance must fall within an objective standard of reasonableness in order to be constitutionally effective.

We need not address the level of prejudice that must be shown to prevail on a claim of ineffective assistance of appellate counsel because we find that Fitzgerald's appellate counsel did not render ineffective assistance.

The only manner in which counsel were alleged to have rendered ineffective assistance on appeal is that they failed to argue the sufficiency of the rape and robbery evidence. Counsel explained at the habeas hearing that he and co-counsel reviewed the entire record and decided not to use a "shotgun approach." In his opinion "the best way to practice appellate law is to pick the points which you think are the strongest and to pursue those and to take the points that should have any real chance of being heard." Having reviewed the evidence of rape and robbery, counsel concluded that "to raise that point on appeal . . . just would weaken other points."

As stated above, the *Evitts* Court acknowledged that appellate counsel need not advance every argument. 469 U.S. at 394. Further, in *Strickland* the Court stated: "[A] court deciding an ac-

---

[8] Applied by the Supreme Court of Virginia in *Dept. of Corrections v. Clark*, 227 Va. 525, 533-36, 318 S.E.2d 399, 403-04 (1984).

tual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. In addition, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* These principles are equally applicable to appellate counsel's performance. Here, the strategic choice made by counsel not to challenge the sufficiency of the rape and robbery evidence in favor of narrowing their arguments to those thought more meritorious was reasonable under all the circumstances. Their performance in this regard was not, therefore, constitutionally defective and we affirm the habeas court's dismissal of this claim.

For the reasons herein stated, we find that the habeas court did not err in dismissing those claims raised in Fitzgerald's habeas petition over which we have appellate jurisdiction. To that extent, the judgment is affirmed. Those claims relating to the capital murder conviction are dismissed for lack of jurisdiction.

*Affirmed in part*;
*dismissed in part*.

Koontz, C.J., Barrow, J., Cole, J., Coleman, J., Duff, J., Hodges, J., and Moon, J., concurred.

Benton, J., dissenting.

I dissent from that portion of the majority's opinion concerning the testimony of prosecution witness Wilbur Caviness. I believe that the appellant, Edward B. Fitzgerald, is not precluded from raising on habeas review his claim that the Commonwealth failed to disclose exculpatory evidence pertaining to the prosecution witness Caviness. Furthermore, I believe that Fitzgerald's petition for a writ of habeas corpus should have been granted because of a denial of due process in connection with the testimony of prosecution witness Caviness.

Prior to trial, the defense filed a motion for discovery and inspection which requested:

Pursuant to *Brady v. Maryland*, 373 U.S. 1 1963[sic], any and all evidence of any kind whatsoever, known by the Commonwealth's Attorney to be within the possession, custody or control of the Commonwealth, or which the exercise of due

diligence should be known by the Commonwealth's Attorney to be within the possession, custody or control of the Commonwealth, which is favorable, exculpatory, or relevant to the defendant as to guilt or punishment, or which affects the credibility of any of the Commonwealth's anticipated witnesses, or which is in any way inconsistent with evidence presented, or anticipated to be presented by the Commonwealth.

In response to that motion the Commonwealth stated:

The Commonwealth is not aware of evidence of an exculpatory nature which is clearly supportive of a claim of innocence, or of such substantial value of the defense that elementary fairness requires it to be disclosed. *United States v. Agurs*, 965 [sic] S. Ct. 2392 (1976), 427 U.S. 97. The Commonwealth is unable to ascertain what may affect the credibility of any of the Commonwealth's witnesses, nor what may be inconsistent with evidence presented. These are matters counsel must contend with at trial. While some courts recognize the requirement of materiality is met where the evidence would only affect the credibility of witnesses, Virginia is not one of those courts. See paragraph 2 *supra*, citing *Bellfield*. While this may not be an attempt to ascertain names of Commonwealth's witnesses, it would amount to an indirect approach to that which cannot be had directly.

When the Commonwealth filed this response, Caviness was known by the Commonwealth to be a valued witness and was known by an assistant commonwealth's attorney on the prosecution team to be acting as an active informant for the police. That same assistant commonwealth's attorney had successfully prosecuted Caviness a few months earlier.

It thus would appear that the Commonwealth's response, indicating that it "is not aware of evidence . . . of such substantial value to the defense that elementary fairness requires it to be disclosed," was untrue. Although the defense did not know that Caviness would be called as a witness for the Commonwealth and, therefore, could not at the time specify Caviness as the object of its motion, the Commonwealth should have been alerted to the

fact that among its proposed witnesses was a convicted felon who had a substantial history as an informant for both the local and state police. The Commonwealth's response was not merely an erroneous statement of the law but, when fairly read, was a representation to the defense that the requested evidence did not exist. Fitzgerald's trial counsel had no reasonable basis upon which to conclude that the Commonwealth's response to the *Brady* request would provide a ground for attack on direct appeal. It follows that Fitzgerald should not now be precluded from obtaining review of this issue in the habeas proceeding.

Additionally, the response made by the Commonwealth creates an error of constitutional dimensions mandating a new trial. In *United States v. Bagley*, 473 U.S. 667, 678 (1985), the Supreme Court held:

> The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination . . . . [S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," *Unites States v. Agurs*, 427 U.S., at 112, 96 S. Ct., at 2401, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

The record amply demonstrates that the nature of evidence withheld was such that its suppression undermined confidence in outcome of this trial. In the habeas trial, the Commonwealth's attorney who prosecuted the case conceded that Caviness's testimony was "not unimportant" and was an "extremely valuable piece of prosecution evidence." Caviness testified that Fitzgerald confessed to him that Fitzgerald raped the victim. This was the only evidence in the case which established with a degree of certainty the act of penetration which was necessary to prove the offense of rape. *See Elam v. Commonwealth*, 229 Va. 113, 115, 326 S.E.2d 685, 686 (1985). Proof of this essential fact was dependent upon Caviness' credibility as a witness. Thus, the failure of the Commonwealth to provide evidence of Caviness' extensive criminal record deprived the defense of the opportunity to subject Cavi-

ness to a meaningful probing of his bias, interest, and credibility.

Likewise, the failure to inform the defense of Caviness' status as an informant substantially disadvantaged Fitzgerald in cross-examination of Caviness. The record in the habeas trial indicates that beginning in 1974 and continuing through the date of Fitzgerald's trial Caviness was an active informant for Detective William R. Shuman of the Richmond Police Department and had been an informant on a "countless" number of cases, estimated to be "50 maybe." *The same year Caviness was incarcerated with Fitzgerald, Caviness was one of Shuman's best informers. The victim was also an active informant for the same Detective Shuman.* Furthermore, Caviness had several conversations with Detective Shuman while he was incarcerated in the same jail with Fitzgerald. Although Detective Shuman testified that the discussions which he had with Caviness in the jail concerned a third party and the charges pending against Caviness in Henrico County, Caviness testified that he reported his conversations with Fitzgerald to Detective Shuman while he (Caviness) was incarcerated.

Larry Burchett, a state police officer, also visited Caviness in jail approximately six times during the time that Caviness and Fitzgerald were incarcerated in the same jail. Burchett arranged for Caviness to be appointed jail trustee and provided Caviness with other services while he was incarcerated. Burchett testified that Caviness wanted to make amends for his involvement in the Chesterfield burglaries. Additionally, Caviness wanted assistance in getting out of jail and in connection with pending felony charges in Henrico County. During one of his visits, Burchett told Caviness that something would be done about the pending felony charges in Henrico. Burchett recalled learning on the day after he made that promise to Caviness that Caviness had agreed to testify against Fitzgerald. Caviness testified that he was informed in 1981, on a date that he could not recall, by a police officer, whose name he could not recall, that the Commonwealth Attorney, whose office was prosecuting Fitzgerald, would speak to the Henrico County prosecutor concerning the felony charges pending against Caviness in Henrico County.

Additionally, two months before Fitzgerald's trial, the Commonwealth Attorney in Norfolk prosecuted Caviness for three bad check charges and for violation of his probation on two sodomy

convictions. Burchett informed him that Caviness was an informant in ongoing investigations, and Burchett testified in the City of Norfolk circuit court that Caviness deserved consideration for his services as an informant. As a result, Caviness was sentenced to probation on the petit larceny charges and his sodomy probationary sentences were continued.

Clearly, a cross-examination of Caviness based upon these and the other voluminous facts disclosed at the habeas corpus hearing could have substantially damaged his credibility by establishing a motive for false testimony and, thus, could have been determinative of the jury's finding of guilt with respect to the rape charge. "[I]t is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). In my opinion, the suppression of Caviness' status as a paid informant sufficiently undermines confidence in the jury's finding to entitle Fitzgerald to a new trial on the charge of rape.

Even if I were persuaded that Fitzgerald should be precluded from raising on habeas review the failure of the Commonwealth to disclose exculpatory evidence, I would still conclude that Fitzgerald is entitled to a new trial because of my belief that there is a reasonable likelihood that the judgment of the jury was affected by Caviness' false testimony. Where false testimony, knowingly introduced by the Commonwealth, "may have had an effect on the outcome of the trial," a new trial is required to fulfill the mandate of due process. *Napue v. Illinois*, 360 U.S. at 272. In *Giglio v. United States*, 405 U.S. 150 (1972), the Court stated that the question to be resolved is whether " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " *Id.* at 154 (quoting *Napue*, 360 U.S. at 271). The overriding concern of the court, therefore, must be whether the defendant was deprived of a fair trial. *See U.S. v. Agurs*, 427 U.S. 97, 108 (1976).

I agree with the majority's determination that the Commonwealth's attorney should have known that Caviness testified falsely regarding his prior convictions and the pending criminal charges. I disagree, however, with the conclusion that there was no "reasonable likelihood" the false testimony affected the judgment of the jury.

By failing to disclose that Caviness was an informant and by offering Caviness' testimony mis-stating his criminal record, the Commonwealth placed before the jury an incomplete picture of one of its major witnesses. Neither the jury nor the defense had an opportunity to learn the falsity of Caviness' statement that there was "nothing nobody could offer" him for his testimony. Consequently, the jury never had the opportunity to measure Caviness' self-serving statement against the significant services that Shuman and Burchett performed for him.

Moreover, there is a significant difference between what the jury was told and the truth regarding Caviness' criminal history. The jury was informed through direct examination of Caviness that Caviness had been convicted of one felony, that he had been convicted of "something like" a misdemeanor involving moral turpitude, and that he was not charged with anything "right now." On cross examination, Caviness repeated that he had been convicted of only one felony. What was not disclosed to the defense, and what the jury did not learn, was that at the time of Fitzgerald's trial Caviness had the following criminal convictions: two felony convictions for sodomy, a felony conviction for breaking and entering, a conviction of contributing to the delinquency of a minor, and nineteen (19) convictions of petit larceny. Furthermore, at the time of the trial Caviness was under indictment for felony charges of breaking and entering and grand larceny.

Disclosure of the fact that Caviness was not merely "a convicted felon" but had a significant criminal history undoubtedly would have had a significant impact upon the jury's weighing of Caviness' credibility. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . . ." *Napue v. Illinois*, 360 U.S. at 269. In evaluating Caviness' testimony and determining the credit to be given it, the jury was entitled to know the number and nature of his prior convictions. *See Hummel v. Commonwealth*, 217 Va. 548, 550, 231 S.E.2d 216, 217 (1977). Additionally, "the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner . . . [did not turn] what was otherwise a tainted trial into a fair one." *Napue v. Illinois*, 360 U.S. at 270.

Moreover, I find no basis in the record to support the majority's apparent conclusion that Caviness' testimony was inherently cred-

ible. Caviness testified that he (Caviness) asked Fitzgerald "why he would do such a thing as kill this woman and cut her up." The response which Caviness attributed to Fitzgerald does not substantially correspond with either the co-defendant's testimony or the pathologist's testimony as to the manner in which the victim's body was mutilated.

There is also no basis in this record to support the majority's assertion that "Caviness' testimony that Fitzgerald committed the crime because Cubbage 'snitched on him' corresponded with Johnson's testimony that . . . Fitzgerald had been mumbling about how [the victim] had 'ripped him off.'" There is no basis for the conclusion that "snitched on him" and "ripped him off" are of the same import. The record reflects that Fitzgerald commented, after he sampled a drug which may have been supplied by the victim, that the victim "ripped him off." In contrast, the testimony establishes that "snitch" is "another word for 'informer.'"

Thus, the majority's interpretation of Caviness' testimony is unsound and undermines its conclusion that Caviness' testimony "contained aspects of the crime which had not been released to the public" and, therefore, was inherently credible. Even if it is assumed that the majority is correct in its conclusion that Caviness testified as to non-public facts, the habeas record provides a basis upon which had the defense known of Caviness' status as an informant it could have argued that Caviness had the opportunity to learn those facts from sources other than Fitzgerald.

For the foregoing reasons, I believe that the record in this case supports a conclusion that Fitzgerald was denied a fair trial on the charge of rape and should be granted a new trial.